*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0398P (6th Cir.)
File Name: 03a0398p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

WYMAN CASTLEBERRY,
  *Petitioner-Appellant,*

  *v.*

No. 02-3433

ANTHONY J. BRIGANO,
Warden,
  *Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 00-01122—George C. Smith, District Judge.

Argued: October 24, 2003

Decided and Filed: November 12, 2003

Before: DAUGHTREY and GILMAN, Circuit Judges;
HAYNES, District Judge.[*]

---

[*] The Honorable William J. Haynes, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

---

## COUNSEL

**ARGUED:** Stephen P. Hardwick, PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. M. Scott Criss, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, for Appellee. **ON BRIEF:** Stephen P. Hardwick, PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. M. Scott Criss, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, for Appellee.

---

## OPINION

---

RONALD LEE GILMAN, Circuit Judge. Wyman Castleberry was convicted in an Ohio state court of aggravated murder and aggravated robbery. After exhausting his state court remedies, Castleberry petitioned the district court for a writ of habeas corpus. He argued that the prosecution withheld the following evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963): (1) a statement by the victim describing his assailant in a way inconsistent with Castleberry's appearance, (2) a statement to detectives indicating that the prosecution's key witness had been plotting to rob the victim, and (3) statements by neighbors of the victim describing suspicious individuals in the vicinity of the shooting who did not match Castleberry's appearance. The district court denied the writ. For the reasons set forth below, we **REVERSE** the judgment of the district court and **GRANT** Castleberry a conditional writ of habeas corpus that will result in the vacation of his conviction and sentence unless the state of Ohio commences a new trial against him within 90 days after this judgment becomes final.

## I.  BACKGROUND

The charges against Castleberry arose from the shooting of Jose Soriano, resulting in Soriano's death several months later.  Following a mistrial in July of 1991, a second jury trial commenced in February of 1992 and concluded nine days later.  Castleberry was sentenced to life with parole eligibility after twenty years, plus three years of additional incarceration for the use of a firearm.

The following facts are based upon the summary provided by the Ohio Court of Appeals in its de novo review of the final order by the state trial court denying Castleberry's petition for post-conviction relief:

On March 29, 1990, detectives David Morris and Sharon Ceckitti were dispatched to Soriano's apartment, which was located across the street from Jason's Bar and near a grassy area where people from the neighborhood often gathered. Soriano could not be interviewed at the scene due to his wound.  From the time of the shooting until Soriano's death several months later, there were no significant leads in the case.  Morris eventually interviewed Soriano's parents, however, which led to his contacting Kenneth "Chief" Thomas.

Detectives Morris and Ceckitti interviewed Thomas at the Orient Correctional Institution in September of 1990, where he was incarcerated as the result of a conviction for receiving property stolen from apartments adjacent to Soriano's. Morris testified that "right off the bat he [Thomas] said Wyman Castleberry did it."  According to Morris, Thomas "did not make any requests prior to the interview," but the detective later received a request from Thomas's attorney to write a letter to a judge on Thomas's behalf.  Morris acknowledged that he wrote the letter and that Thomas was granted early release from prison.

Testifying for the prosecution, Thomas said that he went to Jason's Bar at 8:00 p.m. on the evening of the shooting with his friend Carl "Skeeter" Gamble.  He claimed to have seen Castleberry, whom he says he knew from the neighborhood, walk across the street toward the back of Soriano's apartment while holding a small gun, knock on the back door, and then ask for "a bag of weed."  Thomas testified that he heard a single gunshot a "couple seconds" after Soriano opened the door and that he then saw Castleberry exit the apartment. According to Thomas, Castleberry asked him to "say nothing to nobody about what happened" when they saw each other the next day at Jason's Bar.

Parts of Thomas's testimony were supported by the testimony of other witnesses.  One was Thomas's friend Gamble, who testified that he had been drinking with Thomas at Jason's Bar on the night of the shooting and that he saw Castleberry at the bar.  According to Gamble, Castleberry "was talking about robbing the . . . dope man, the dude that sells weed."  Gamble claimed that Castleberry had a gun with him as "he walked up [to Soriano's apartment,] . . . knocked on the door[,] . . . and then . . . there was a fire off."  He said that later, at Jason's Bar, Castleberry told him that "the dude tried to grab the gun and he shot it and the gun went off." Morris, in his testimony, said that when he first questioned Gamble, "there was an indication that Gamble was not telling the truth."  Gamble eventually "told the truth," however, after Gamble was told what Thomas had said to the detectives and Gamble's "father made a comment to his son."

Another Jason's Bar patron who supported Thomas's testimony was Thomas Bailey.  Bailey took the stand to say that he had heard a gunshot and, approximately one hour later, Castleberry had said: "the guy tried to take the gun from him and it went off."

Still another prosecution witness supporting Thomas was Orlando Wilborn, who testified that he, his brother Thomas Wilborn, "Chief" Thomas, and Gamble had been drinking at

his house on the evening of the shooting. He said that some time after Thomas and Gamble left his house, he and his brother went to Jason's Bar. According to Orlando Wilborn, he was standing near the bar when he heard a gunshot. He said that he immediately ran to his car, where his brother, who was already at the car, remarked: "[T]hose guys are crazy, they tried to rob the weed spot."

Wilborn's brother, Thomas Wilborn, also testifying for the prosecution, said that after getting a drink at Jason's Bar, he went across the street to the grassy area to join a group of about 15 to 20 people, and that Castleberry was standing among them with a gun. He claimed that someone in the group spoke of a "place where you buy marijuana." At the time he heard the gunshot, Thomas Wilborn said, he could see both his roommate Lamont Martin and Thomas standing near a wall in the grassy area.

Martin was the prosecution's final witness. He claimed that he saw Castleberry go behind the apartment complex across the street while Martin, Gamble, and Thomas walked to the front of the complex. According to Martin, he was on his way "to see if he [Castleberry] was going to rob the dope man" when he heard a gunshot and ran back to the bar.

Castleberry testified on his own behalf. He claimed that he did not know Soriano, had never been to Soriano's apartment, never owned a firearm, and did not have one in his possession on the night of the shooting.

Another defense witness was James Correy, who lived in Soriano's apartment complex. He said that on the night of the shooting he heard a gunshot as he went to answer a knock at his door by a man he identified only as "Albert." Albert pushed him back into the apartment, from where they observed two men running between the apartments.

Castleberry's mother also testified for the defense. She said that on July 10, 1991 (during the first trial that was

subsequently declared a mistrial), she overheard Thomas say to someone in the hallway outside of the courtroom: "I don't know what good I can do when all I did was walk in and find him."

The conflicting testimony of the witnesses was the sole evidence presented at trial. No physical or forensic evidence was introduced to link Castleberry to the crime.

The Ohio Court of Appeals noted that the following additional facts were revealed at the hearing conducted on Castleberry's post-conviction petition:

During the course of canvassing the neighborhood and conducting interviews, Detective Morris interviewed Judy Thomas of 3413 Bexvie, Apartment B, located diagonally from Mr. Soriano's apartment. Ms. Thomas told the police that at approximately 8:15 on the evening of the shooting, she was watching television. When she heard two men arguing outside, she looked out her window and saw two thin black men, one of whom was "tall" and the other was somewhat shorter. This argument was taking place while the two men were standing on a front porch shared by Mr. Soriano's residence and a next door residence. According to Ms. Thomas, one of the two men said, "You mother f . . . . . , I'll kick your ass." The men stepped down to the sidewalk area and looked over at Ms. Thomas, who immediately closed her drapes. The police summary of this interview was not provided to defense counsel.

The police also interviewed Suntina Neddles, who resided at 3419 Bexvie, Apartment E, located just north of Mr. Soriano's apartment building. Ms. Neddles told police that she was looking at the parking lot area out of her upstairs window. She saw two male, black subjects exit a car which had been between two buildings. She believed that there were two other black males who stayed inside the car. Soon thereafter, she heard what she

thought was the sound of a gunshot. She did not see the two men who had exited the car and walked between the buildings. However, she did see the two men who had stayed in the car (now parked in the lot) drive away from the area. The police summary of this interview was likewise never provided to defense counsel.

The police also interviewed Cerrie Clark, of 3407 Bexvie, Apartment A, located diagonally from the Soriano apartment. Ms. Clark told the police that between 8:00 and 8:30 p.m., she looked out of her front window, facing the parking lot. She saw three male, black subjects walking between the apartment buildings on the east side of the complex. Minutes later, she heard a car driving out of the parking lot at a high rate of speed.

Two days after Mr. Soriano was shot, Detectives Morris and Ceckitti interviewed the victim at the hospital. Mr. Soriano told the police that he did not know the identity of the person who shot him. The victim described the lone gunman as male, dark-black skin, who was 5'6" to 5'8", who had short hair and was clean-shaven. This information from the victim himself regarding the description of his assailant was never provided to defense counsel. There was testimony at the [post-conviction] hearing indicating that on the date of the shooting, appellant wore a goatee and, thus, was not "clean-shaven."

The police interviewed James Johnson again in September 1990. According to the statement he provided to police (after the detectives informed him what "Chief" had told them), Johnson told the detectives that he heard Kenneth "Chief" Thomas plotting the robbery of Soriano. This interview was never related to defense counsel.

*State v. Castleberry*, 1999 WL 1009738, at *6-7 (Ohio Ct. App. Nov. 9, 1999).

After exhausting his remedies in the state courts, Castleberry petitioned the district court for a writ of habeas corpus on September 26, 2000. The Magistrate Judge issued a Report and Recommendation to deny the petition on May 30, 2001. Adopting the Report and Recommendation on April 7, 2002 over Castleberry's objection, the district court later granted Castleberry's motion for a certificate of appealability. The present appeal followed.

## II. ANALYSIS

### A. Standard of review

Castleberry filed his petition for a writ of habeas corpus after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996. Accordingly, we may not grant habeas relief unless the state court's decision either (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The Supreme Court explained these concepts in *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000), as follows:

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

A state trial court's findings of fact must be accepted unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). In cases arising under § 2254, we accord deference to the state appellate court's "determination of what the trial judge found." *Parker v. Dugger*, 498 U.S. 308, 320 (1991).

Castleberry argues that evidence was withheld in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that a defendant's due process rights are violated where the government withholds evidence favorable to a defendant that is "material either to guilt or to punishment"). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Favorable evidence is material for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Jamison v. Collins*, 291 F.3d 380, 385 (6th Cir. 2002) ("The prejudice (or materiality) element of a Brady violation is established if there is a reasonable probability of a different outcome of the trial had the *Brady* material been available."). For purposes of determining reasonable probability, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

## B. The state court's decision is contrary to Supreme Court precedent

The state appellate court rejected Castleberry's petition for post-conviction relief because it found that no single item of withheld evidence was material: "The process which this

appellate court must follow is to evaluate the individual bits of information withheld to determine if the information was beneficial to the defense and material to the guilt or innocence such that the information should have been provided." Because the state court applied only an item-by-item determination of materiality, the decision is contrary to the Supreme Court's decision in *Kyles*, 514 U.S. 419. The Court in *Kyles* specified that the materiality of withheld evidence may be determined only by evaluating the evidence collectively. *Id.* at 436 (*"*The fourth and final aspect of . . . materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item by item."); *see also Schledwitz v. United* States, 169 F.3d 1003, 1012 (6th Cir. 1999) ("[I]n determining whether undisclosed evidence is material, the suppressed evidence is considered collectively, rather than item-by-item, to determine if the 'reasonable probability' test is met."); *United States v. Frost*, 125 F.3d 346, 383 (6th Cir. 1997) (stating that "courts should evaluate the material effect of exculpatory evidence by examining the evidence collectively, not item-by-item").

Curiously, the state court proceeded to misstate the law under *Kyles* even though it had previously noted that Castleberry's "arguments, *considered collectively*, contend that the prosecution repeatedly violated the fundamental discovery rules . . . and that the violations *cumulatively* resulted in the lack of due process." (Emphasis added.)

In its brief, the government acknowledges that the state court performed only an item-by-item determination of materiality: "Having explained why none of the withheld evidence was either exculpatory or material, it should *go without saying* that collectively, the evidence also falls short of establishing a *Brady* violation." (Emphasis added.) The district court, too, noted that the state courts had examined "each item of evidence individually," but the district court nevertheless concluded (without explanation) that it was "not convinced that the cumulative effect of the excluded evidence denied petitioner a fair trial."

Remarkably, in one paragraph of its opinion, the state court of appeals appeared as though it would evaluate the withheld evidence collectively:

> Defense counsel and the jury never knew that Ms. Neddles saw two men go in or near the building where the victim was shot, and then saw a car leave immediately after she heard the shot. Defense counsel and the jury never knew that Ms. Clark could corroborate Ms. Neddles's recollections, including the physical description of the "thin" subjects they saw. The jury and defense did not know that "Chief" had allegedly conspired to rob Mr. Soriano. The jury and defense did not know the details of the victim's description of his assailant, particularly that he was clean-shaven; this was contrary to evidence presented by appellant that he wore a goatee at the time and did not have long hair.

*State v. Castleberry*, 1999 WL 1009738, at *7 (Ohio Ct. App. Nov. 9, 1999). Despite this summary of the withheld evidence, however, the state court never went beyond evaluating the materiality of each individual item of evidence separately. *Kyles* requires a different evaluation. The district court, therefore, erred in determining that the state court decision did not conflict with clearly established federal law, as determined by the Supreme Court.

## C. The state court's decision involved an unreasonable application of Supreme Court precedent

As the result of its de novo review of the state trial court's post-conviction proceedings, the state court of appeals concluded that Castleberry's trial produced an outcome worthy of confidence. The state appellate court reached its conclusion after applying a standard that has been rejected by the Supreme Court, as discussed above. But even if the state court had identified the correct legal standard and had evaluated the evidence collectively, we conclude that it could

not have reasonably believed that the outcome of Castleberry's trial was worthy of confidence under *Brady*.

In its de novo review, the state appellate court identified three items of withheld evidence, which, had they been evaluated collectively, strongly support the conclusion that Castleberry's trial did not produce an outcome worthy of confidence. The first item of withheld evidence involved the description of his assailant that Soriano gave to the detectives, which differed from Castleberry's appearance in terms of both height and facial hair. Soriano said that his assailant was "5'6" to 5'8", had short hair and was clean-shaven." The state court of appeals noted that "[t]here was testimony at the [post-conviction] hearing indicating that on the date of the shooting, [Castleberry] wore a goatee," and that "[w]ritten police records indicate that Mr. Castleberry is a male, black, height 5'10", weight 170 pounds." In addition, the state appellate court noted that "a photograph of Wyman Castleberry taken three weeks after the shooting shows identification information of 5'9", 221 pounds, very dark complexion with a moustache."

Because Soriano was the sole witness to the actual shooting, his description of the assailant would have been highly relevant evidence for the jury to consider had it not been withheld by the government. The state appellate court offered a theory to account for the discrepancy between Soriano's description of his assailant and Castleberry's appearance: "Given Mr. Soriano's occupation as a drug dealer, Mr. Soriano may have had a motive to conceal what he knew about his assailant from police, either through his distrust of the police or out of a desire to extract his own street justice at a later time." Based largely on this conjecture, the state court concluded that "[u]nder the circumstances, we cannot say that police or prosecuting attorneys knew that the description given by Jose Soriano was inaccurate or that it described someone other than Wyman Castleberry." But whether "the police or prosecuting attorneys knew that the description . . . was inaccurate or that

it described someone other than Wyman Castleberry" is irrelevant in determining whether evidence was withheld in violation of *Brady*. *Jamison v. Collins*, 291 F.3d 380, 385 (6th Cir. 2002) (noting that whether the evidence was withheld "intentionally or not" is irrelevant); *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000) ("The [*Brady*] inquiry is objective, independent of the intent of the prosecutors.").

The second item of evidence withheld by the government would certainly have undermined the credibility of Thomas, the government's key witness—a statement by Johnson that "he heard Kenneth 'Chief' Thomas plotting the robbery of Soriano." By withholding this evidence, the government was able to prevent the jury from learning that Thomas, because he was an obvious potential suspect himself, had a motive to point to Castleberry as the assailant. Impeachment evidence, like exculpatory evidence, is subject to the disclosure under *Brady*. *Strickler v. Greene*, 527 U.S. 263, 280 (1999) ("[T]he duty [to disclose evidence] encompasses impeachment evidence as well as exculpatory evidence . . . .").

The third area of withheld evidence identified by the state appellate court involved witness accounts of suspicious persons in the vicinity of the attack on Soriano:

> Defense counsel and the jury never knew that Ms. Neddles saw two men go in or near the building where the victim was shot, and then saw a car leave immediately after she heard the shot. Defense counsel and the jury never knew that Ms. Clark could corroborate Ms. Neddles's recollections, including the physical description of the "thin" subjects they saw.

In addition, the government withheld a statement by Ms. Thomas, a neighbor of Soriano, that on the night of the shooting she heard one of the two men whom she saw arguing on Soriano's porch exclaim: "You mother f . . . . . , I'll kick your ass."

These statements, given to detectives by three neighbors of Soriano, point to a number of other possible suspects, and among them might be the one described by Soriano as his assailant. The state court, however, dismissed the statements of the neighbors as having "no demonstrated ties to the shooting."

True enough, some of the testimony by the patrons at Jason's Bar on the night of the shooting would not have been contradicted by the withheld evidence. The key question, however, "is not whether the state would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same." *Kyles*, 514 U.S. at 453.

In *Kyles*, the Court noted:

> Not every item of the State's case would have been directly undercut if the foregoing *Brady* evidence had been disclosed. It is significant, however, that the physical evidence remaining unscathed would . . . hardly have amounted to overwhelming proof that Kyles was the murderer. . . . The inconclusiveness of the physical evidence does not, to be sure, prove Kyles's innocence, and the jury might have found the eyewitness testimony . . . sufficient to convict . . . . But the question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same. Confidence that it would have been cannot survive a recap of the suppressed evidence and its significance for the prosecution.

*Id*. at 451, 453.

The same is true in the present case. As well-summarized in Castleberry's brief:

The evidence, taken together, indicates that the State's star witness was involved with the crime and that Mr. Soriano's killer was shorter, thinner and more clean-shaven than Mr. Castleberry. More specifically:

- A jury should be allowed to weigh the victim's withheld statement that his killer was a clean-shaven man who was 5'6" to 5'8" against evidence that Mr. Castleberry was 5'9" to 5'10" and wore a goatee at the time of the crime.

- A jury should consider the importance of the withheld testimony of three of the victim's neighbors who—collectively—observed two *thin* men go in or near the building where the victim was shot and say, "You mother f . . . . . , I'll kick you ass." One of the witnesses then saw a car leave immediately after she heard the shot. Mr. Castleberry was 221 pounds at the time of the crime.

- Finally, a jury should be allowed to weigh the credibility of the State's star witness, Kenneth "Chief" Thomas, against the withheld testimony of a witness who told the police that "Chief" had planned to rob the victim.

No reasonable court can have confidence in the decision of a jury that did not hear this withheld evidence.

[Emphasis in original.] We agree. With this additional evidence, there is certainly a "reasonable probability of a different outcome of the trial had the *Brady* material been available." *Jamison v. Collins*, 291 F.3d 380, 385 (6th Cir. 2002).

### III. CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **GRANT** Castleberry a

conditional writ of habeas corpus that will result in the vacation of his conviction and sentence unless the state of Ohio commences a new trial against him within 90 days after this judgment becomes final.