NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0885n.06

No. 14-5017

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Nov 25, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| WILLIAM EAKES, III, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT |
| v. | ) | FOR THE MIDDLE DISTRICT |
| | ) | OF TENNESSEE |
| DAVID SEXTON, WARDEN, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |

---

BEFORE: McKEAGUE and GRIFFIN, Circuit Judges; and POLSTER, District Judge.[*]

POLSTER, District Judge. On May 22, 1998, Jerry Barnes and his 18-year old nephew, William (Billy) Eakes, III, killed Tehition Christman at a Motel 6 in Nashville, Tennessee. Two days later, Barnes and Eakes were arrested and confessed to the murder. In separately taped confessions, both Barnes and Eakes stated that Tehition came to the hotel to sell them cocaine, that Barnes and Tehition got into an argument about the amount of the cocaine, and that the argument turned physical and culminated in Tehition's death. This scenario supported a charge of second-degree murder, exposing Eakes and Barnes to prison sentences of 15 to 60 years. After persistent urging from Tehition's parents, however, the State also charged Eakes and Barnes with first-degree murder – pursuing a theory of felony murder requiring the State to prove that Eakes and Barnes intended to rob Tehition when they killed him. The two witnesses were tried separately. A key witness at

---

[*]The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

Eakes' trial was Myra Christman, Tehition's mother, who provided the only evidence regarding the valuables in Tehition's possession the night he was killed. Eakes was convicted of felony murder as well as second-degree murder, and was sentenced to life in prison. Eakes' felony-murder conviction was affirmed on appeal and post-conviction relief was denied. At the subsequent trial of Barnes, Myra Christman did not testify and the jury was unable to reach a verdict on felony murder. Barnes subsequently entered a guilty plea to second-degree murder and was sentenced to 20 years in prison.

In 2013, Eakes filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 that the district court denied after a hearing. Although the district court denied the petition, it granted a certificate of appealability on Eakes' *Brady* claim. Because we cannot affirm the district court's ruling and are constrained by statute from granting unexhausted claims, we vacate the district court's ruling and remand with instructions to stay further proceedings should Eakes elect to pursue exhaustion of any available state remedies.

**I.**

At approximately 9:30 p.m. on Friday, May 22, 1998, Tehition Christman left his parents' house in his white 1992 Nissan after receiving a phone call. Tehition told his parents that he would be back shortly after he went to Corey Watkins' house. That was the last time Myra Christman saw her son alive.

At approximately 10:30 p.m. that night, Tracy Rosser, the manager of a Motel 6 just a few miles from the Christmans' home, knocked on the door of a room registered to Barnes (a 38-year old exterminator with a cocaine problem who was referred to by local drug dealers as "the bug man"). She noticed that some of the curtains had been ripped off the drapery hooks. She knocked on the

door several times, to no avail. Finally, when she threatened to call the police if the door was not opened, Barnes opened the door just far enough to stick his head out. When she asked Barnes about the curtains, he said "they" were just having rough sex. She said the motel did not allow parties, and that if there were any disturbances from that room, they would have to leave.

The next day, after Barnes had vacated the room, a housekeeper reported to the manager that he had found blood and other signs of a violent struggle in Barnes' room. Police, upon notification, examined and secured the room. They then went to Barnes' home where they found blood on his truck and bloody clothes in his washing machine. Police received information that Barnes routinely rented hotel rooms in the area (his wife would testify at trial that she did not allow him to do drugs at home in the presence of their children). On Sunday morning, police tracked down Barnes and Eakes at a Super 8 Motel near the Motel 6. Just as officers approached their room, Barnes and Eakes walked outside and, soon after, confessed to Tehition's murder.

Both gave recorded confessions saying that Tehition had come to Barnes' room to sell them crack cocaine, Tehition and Barnes got into an argument over the amount of the cocaine, and the argument turned physical. Eakes stated that he became involved in the fight only when Barnes asked for help after Tehition started biting Barnes' thumb. Eakes said that he initially hit Tehition with a telephone, then went outside to the truck, got an axe, came back in, and hit Tehition in the back of the head with the blunt side of the axe. Eakes stated that his uncle started choking Tehition, and he helped by putting his hands over his uncle's hands and pressing down.

Barnes guided police to where he had hidden Tehition's car and body, and Eakes showed them the location of the axe and the bloody hotel bedding. An autopsy showed that Tehition, at the time of death, was under the influence of cocaine.

When Tehition did not come home Friday night, Myra Christman knew that something was wrong because he did not respond to her numerous pages despite his habit of quickly responding to them. At midday on Sunday, however, when Officer Jim Malone went to Tehition's house inquiring about the white Nissan and who was driving it, Myra and Thomas Ward, Tehition's stepfather, were both "very evasive." (R. 69-1.) Despite the fact that Tehition had been missing for 36 hours, they refused to disclose Tehition's name and they refused to say at what time they had last seen him. Officer Malone memorialized this encounter in a report dated May 24, 1998. This report was never disclosed to Eakes.

On June 1, 1998, a Victim Advocate wrote the following comments in a report after interviewing Tehition's parents ten days after the murder:

> Victim's family can be a handful. They don't want to believe that vic was involved w/drugs. They believe he was set up and want both [defendants] to either get the death penalty or life w/out parole.

(R. 69-2.) This report was never disclosed to Eakes.

On August 3, 1998, Assistant District Attorney (ADA) James Milam, the first prosecutor on the case, interviewed Tehition's parents. Myra "did most of the talking," though each of the parents showed general agreement with what the other parent said. ADA Milam memorialized this interview in a letter to lead detective Johnny Lawrence. ADA Milam reported, among other things:

> [Myra] related that on Friday, May 22, she had taken her son's income tax refund check in the amount of approximately $474 and deposited all but $175 of that amount in the Aladdin Industries Credit Union. She had received $175 in cash which she had given to the victim upon her return home from work that day. She thinks that she can locate her credit union statement showing the deposit on that date and possibly the deposit slip as well.
>
> The significance is that the victim had this money with him when he left home around 9:45 after receiving a phone call from Corey Watkins.

4

The parents recalled that the victim was watching a Chicago Bulls play-off game when the phone rang and that he told them he would be back shortly after he went to Corey's.

(R. 69-3 at 2.) Myra also told ADA Milam that when Tehition left, he was wearing a gold watch worth $300 that she had given him for his birthday and a $575 nugget ring with diamonds that she had given him for Christmas.

The Milam letter also reveals that Tehition's parents thought he was either set up by Corey Watkins or that Corey was somehow involved in Tehition's murder. They told ADA Milam that Corey lied about his contact with Tehition on the morning of his murder, and that Corey must have possessed Tehition's pager after his death because Corey had supposedly retrieved a private phone number off the pager and was using the pager to receive calls.

Finally, ADA Milam stated:

The parents also reported that a man named Michael Childs, telephone number 226-6641, told them that Jerry Barnes had called him and told him to come to the motel, because he had beat somebody down and had a car for sale. This man's brother, Kevin Childs, who has the same phone number, supposedly told the parents that Barnes said he had taken some money off a guy and had a homicide on his hands.

(Id. 3.) The Milam letter was never disclosed to Eakes.

Handwritten notes dated March 21, 2000 and found in the files of ADA T.J. Haycox, the second prosecutor on the case, state that when he interviewed Kevin Childs, Kevin denied that Barnes ever told him he murdered anyone stating, instead, that Barnes told him "he & guy had got into it & he beat him up (not that he killed him)." These notes were never disclosed to Eakes.

That same day, ADA Haycox typed up a report summarizing his case notes. With regard to his interview of Kevin Childs, he reported that he spoke to Kevin Childs who said that he saw Barnes at some apartments shortly after the murder and that he saw a bite mark on Barnes' thumb,

5

but he did not remember Barnes making any incriminating statements. ADA Haycox further reported that the family refused to believe their son had anything to do with drugs despite the autopsy report and Tehition's criminal history. He reported that "the most likely scenario is that the victim came to deliver drugs, there was an argument which turned physical, and in the process Barnes and Eakes killed the victim." (R. 69-5.) He concluded that "[the parents] have larger ideas about the case than the facts support." (Id.) This document was never disclosed to Eakes.

In March 2000, Officer Rose Berne interviewed Michael Childs at ADA Lisa Naylor's request. (ADA Naylor assisted ADA Pamela Anderson at Eakes' October 2000 trial.) Officer Berne reported that Michael Childs denied having any contact with either Barnes or Eakes around the time of the murder. This report was never disclosed to Eakes.

Before trial, Eakes filed a motion seeking *Brady* material. None of the aforementioned documents were produced.

Eakes' trial was held in October 2000, well over two years after Tehition's murder. Myra Christman was the first witness, and the key witness on the subject of the robbery element necessary for the first-degree conviction.[1] In very short order, she testified that, on the day of the murder, Tehition asked her for some money, so she took $300 out of a credit union account listed in both their names for herself and Tehition and gave Tehition $175. Myra also testified that "[a]round 9:30, my sister answered my telephone and someone had called Tehition. She said it was a young man but I don't know who." (R. 47-5 at 12.) When Eakes' counsel asked Myra whether she was aware

---

[1] Under Tennessee law, the killing of another committed in the perpetration of a robbery constitutes first-degree murder. Tenn. Code Ann. § 39-13-202(a)(2). In such case, "[the] intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim." *State v. Buggs*, 995 S.W.2d 102, 106 (Tenn. 1999).

6

that her son was into drugs, she responded, "No, sir." (Id. at 21.) And when he asked her if she had any knowledge of her son associating with people who sell drugs, ADA Anderson objected to that question, and the court sustained the objection – foreclosing any further inquiry by Eakes' counsel into the subject. Finally, Myra testified that when Tehition left the house that night, he had on a gold necklace, a $380 watch, a $528 gold ring with diamonds on it, a diamond earring, a $180 dollar pair of Michael Jordan shoes, and the $175 she had given him that day.

The jury found Eakes guilty of first-degree and second-degree murder, and he was sentenced to life in prison. His convictions were affirmed on appeal and his petition for post-conviction relief was denied.

Eakes filed his federal habeas petition *pro se* on December 30, 2009. On May 23, 2013, the district court appointed Michael C. Holley of the Federal Public Defender's Office to represent Eakes. The aforementioned documentary evidence was not discovered until August of 2013, when Attorney Holley received access to the prosecutor's file and asked the court for 30 days to review it. Based on his review, Attorney Holley filed an amended habeas petition detailing the suppressed evidence and supplementing his earlier request for equitable tolling of the one-year period for filing habeas petitions under 28 U.S.C. § 2244(d).

After holding an evidentiary hearing on Eakes' habeas claims, the district court issued an order finding that all but the *Brady* claim were time-barred, and denied the *Brady* claim on the merits. The court did, however, grant Eakes a certificate of appealability on the *Brady* claim.

**II.**

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process, where the evidence is material either to guilt or to punishment, irrespective of

7

the good faith or bad faith of the prosecution. *Kyles v. Whitley*, 514 U.S. 419, 432 (1995) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). To establish a *Brady* violation, a habeas petitioner must establish three elements: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued. *Brooks v. Tennessee*, 626 F.3d 878, 890 (6th Cir. 2010) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

With regard to the first element, the Supreme Court has held that the duty to turn over favorable evidence encompasses impeachment evidence as well as exculpatory evidence. *Giglio v. United States*, 405 U.S. 150, 154 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule.") (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)); *U.S. v. Bagley*, 473 U.S. 667, 676 (1985) ("[S]uch evidence . . . if disclosed and used effectively, [] may make the difference between conviction and acquittal.").

Regarding the second element, due process requires the court to look at the character of the evidence rather than the character of the state actor who failed to disclose it. *Moldowan v. City of Warren*, 578 F.3d 351, 384 (6th Cir. 2009) (citing *United States v. Agurs*, 427 U.S. 97, 110 (1976)).

As to the third element, a habeas petitioner demonstrates prejudice by showing that the suppressed evidence is "material." *Brooks*, 626 F.3d at 892 (citing *Kyles*, 514 U.S. at 433-34). In determining materiality, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. (quoting *Kyles*, 514 U.S. at

8

434). "In making this determination, we review the evidence 'collectively, not item by item.'" *Id.* (quoting *Kyles*, 514 U.S. at 436).

The materiality of *Brady* evidence depends almost entirely on the value of the undisclosed evidence relative to the other evidence produced by the state. *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004) (citing *Smith v. Black*, 904 F.2d 950, 967 (5th Cir. 1990), *vacated on other grounds*, 503 U.S. 930 (1992)). Undisclosed evidence that is cumulative of other evidence is not material. *Brooks*, 626 F.3d at 893 (citing *Carter v. Mitchell*, 443 F.3d 517, 533 n.7 (6th Cir. 2006)). Nor is evidence impeaching the testimony of a witness whose account is strongly corroborated by additional evidence supporting a guilty verdict. *Sipe*, 388 F.3d at 478 (citing *Wilson v. Whitley*, 28 F.3d 433, 439 (5th Cir. 1994)). However, if the impeachment evidence "would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration, the withheld evidence has been found to be material." *Id.* (quoting *United States v. Weintraub*, 871 F.2d 1257, 1262 (5th Cir. 1989)).

That the withheld information may seem inculpatory, as well as exculpatory, on its face in no way diminishes the government's duty to disclose favorable evidence. *United States v. Howell*, 231 F.3d 615, 625 (9th Cir. 2000). Indeed, the Supreme Court recently rejected a state's request for "a certain amount of leeway in making a judgment call" as to the disclosure of any given piece of evidence. *Kyles*, 514 U.S. at 438-39 (noting that the character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record). The *Kyles* Court explained:

> This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence. *See Agurs*, 427 U.S., at 108, 96 S. Ct., at 2399-2400. ("[T]he prudent prosecutor will resolve doubtful questions in favor of

9

disclosure.") This is as it should be. Such disclosure will serve to justify trust in the prosecutor as "the representative . . . of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 633, 79 L.Ed. 1314 (1935)). And it will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations.

*Kyles*, 514 U.S. at 439-40 (citations omitted).

The bias of a witness is "always relevant" in discrediting the witness and affecting the weight of the testimony. *Davis v. Alaska*, 415 U.S. 308, 316 (1974) (internal quotation marks omitted). The right to expose bias is so fundamental that generally applicable evidentiary rules that otherwise limit inquiry into specific instances of conduct do not apply to credibility attacks based on motive or bias. *United States v. Hill*, 322 F.3d 301, 304 (4th Cir. 2003) (citing *Quinn v. Haynes*, 234 F.3d 837, 845 (4th Cir. 2000)). *See, e.g., Smith v. United States*, 283 F.2d 16, 20 (6th Cir. 1960) (bias cannot be classified as hearsay); *United States v. Harris*, 542 F.2d 1283, 1302 (7th Cir. 1976) ("other acts" evidence may be introduced to show bias).

### III.

Billy Eakes admitted to killing Tehition Christman, so the only contested issue of any consequence at his trial was whether he intended to rob Tehition when he killed him. Key testimony on this question was provided by Tehition's mother, since his stepfather could not recall the jewelry Tehition was wearing when he left the house.[2] Without Myra's testimony, the only evidence that

---

[2]Contrary to the district court's conclusion and Respondent's position, Myra Christman's testimony was *not* corroborated by Thomas Ward:

Q.     Can you tell us what he was wearing when he left?
A.     When I saw him that afternoon he had on some blue shorts and a light shirt, striped shirt.
Q.     Did he have on any jewelry?
A.     Jewelry?

10

Eakes or Barnes intended to rob Tehition when they killed him was the fact that Tehition was found in the trunk of his car without his wallet or shoes and his pockets turned inside out.

Because Myra Christman was the key witness in the case, any evidence arguably impacting her credibility or bias was relevant, material, and should have been disclosed to Eakes' counsel prior to trial. *See Harris v. Lafler*, 553 F.3d 1028,1033-34 (6th Cir. 2009). The failure of the State to produce the suppressed evidence is inexcusable.

The district court, in holding that under *Brady* the withheld evidence was immaterial, "never went beyond evaluating the materiality of each individual item of evidence separately." *See Castleberry v. Brigano,* 349 F.3d 286, 292 (6th Cir. 2003) (finding the collective impact of withheld evidence material). In doing so, the district court failed to comply with Supreme Court precedent requiring courts to evaluate withheld evidence collectively, rather than item-by-item. *Id.* ("Because the state court applied only an item-by-item determination of materiality, the decision is contrary to the Supreme Court's decision in *Kyles*. The Court in *Kyles* specified that the materiality of withheld evidence may be determined only by evaluating the evidence collectively." (citing *Kyles*, 514 U.S. at 419)); *see also Brooks*, 626 F.3d at 892 (noting that in determining whether undisclosed evidence is material, the evidence is reviewed "collectively, not item-by-item." (quoting *Kyles*, 514 U.S. at 436)). That the district court failed to look at the suppressed evidence collectively is not the only problem with its analysis of the *Brady* claim. The district court misread the record (the Victim-Advocate's report was drafted two years before the trial, not after the trial); it failed to address ADA

---

Q.      Yes.
A.      Well, I know that he pretty much wore jewelry all the time.
Q.      But do you recall whether or not he had it on that day?
A.      I can't recall.
(R. 47-5 at 35-36; Page 732-33.)

11

Haycox's May 1999 case notes; and it reached an erroneous legal conclusion (contrary to the district court's conclusion that the prosecutor was not responsible for failing to disclose the Victim-Advocate report because the Advocate was located "in a separate part of the District Attorney's office," the prosecutor is in fact responsible for disclosing all *Brady* information in the possession of that office, such as the Victim-Advocate report, even if the prosecutor was unaware of the evidence prior to trial).

The undisclosed evidence was favorable to Eakes because it showed that Myra's trial testimony over two years after the murder was significantly different than her recollection of events just three months after the murder. Without ADA Milam's letter, there was no way for Eakes' counsel to know that Myra was willing to change her initial detailed story about how Tehition came about carrying $175 the night of the murder to conform to the documentary evidence; there was no way for Eakes' counsel to know that Myra earlier gave a different answer about who called Tehition the night he was murdered and left counsel unable to question her about where Tehition said he was going when he left the house; and there was no way for Eakes' counsel to know that Myra added jewelry to the detailed list of items she recounted more than two years earlier. With the Victim-Advocate Report and ADA Haycox's case notes, Eakes' counsel could have attempted to show that Myra's bias and vindictiveness led her to supplement the valuables Tehition supposedly wore to create evidence of Eakes' motive for robbing Tehition. Furthermore, Eakes' counsel could have used this evidence to show that Myra and her husband pressed the State to charge Eakes with felony murder so that he would receive the death penalty or a lifetime prison sentence when the prosecutors initially assigned to the case were reluctant to do so.

Since this evidence could have been used to attack Myra's credibility, it may well have been determinative of Eakes' guilt or innocence on the felony-murder charge. The evidence was material because Eakes' felony-murder conviction rested largely on her testimony which was *not* strongly corroborated. If disclosed and used effectively, this evidence may have made the difference between Eakes' conviction or acquittal on this charge. But the court reviewing a *Brady* claim need not determine whether Eakes can show it was more likely than not that he would have received a different verdict had he possessed that evidence. The question is whether, in its absence, he received a fair trial. *Brooks*, 626 F.3d at 892 (citing *Kyles*, 514 U.S. at 434).

That said, before seeking federal habeas relief, state prisoners must first exhaust their available state court remedies by fairly presenting all their claims to the state courts. 28 U.S.C. § 2254(b); *Rhines v. Weber*, 544 U.S. 269, 274 (2005). "The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) codified the requirement that an applicant for a writ of habeas corpus first exhaust her claims in state court before presenting them to federal court." *Rockwell v. Yukins*, 217 F.3d 421, 423 (6th Cir. 2000). Under AEDPA, for a court to grant relief on the merits of an unexhausted claim, it would have to find either that "there is an absence of available State corrective process," or that "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C § 2254 (b)(1)(B). Here, it appears that there are available state remedies to address Eakes' *Brady* claim.

In Tennessee, a defendant may challenge his conviction and sentence by filing a petition for post-conviction relief under Tennessee's Post-Conviction Procedure Act, Tenn. Code Ann. § 40-30-101 *et seq.* Prior to Eakes' counsel discovering the aforementioned documentary evidence, Eakes filed a state post-conviction petition on two occasions. Both petitions were dismissed. While

13

Tennessee has held that *Brady* claims are not cognizable grounds for reopening post-conviction proceedings, *Harris v. State*, 102 S.W.3d 587, 591 (Tenn. 2003), it has recognized *Brady* claims as grounds for a writ of error coram nobis, *Freshwater v. State*, 160 S.W. 3d 548, 556 (Tenn. Crim. App. 2004) (holding that a *Brady* claim discovered 30 years after conviction may be a cognizable claim in a coram nobis petition and equitably tolling the writ's statute of limitation). Accordingly, it appears that Eakes may have available state remedies.

"[T]he exhaustion requirement is not a jurisdictional one but rather an issue of comity between federal and state courts." *White v. Mitchell*, 431 F.3d 517, 526 (6th Cir. 2005). Thus, a state can waive the exhaustion requirement. *See Harris v. Lafler*, 553 F.3d 1028,1032 (6th Cir. 2009). However, "[a] state shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." 28 U.S.C. § 2254(b)(3). Here, the State has not expressly waived its non-exhaustion defense, and none of the State's actions before the district court can be reasonably construed as an express waiver. While the State has not raised non-exhaustion on appeal, this court may raise non-exhaustion *sua sponte. See, e.g., Clinkscale v. Carter*, 375 F.3d 430, 436-37 (6th Cir. 2004); *King v. Berghuis*, 744 F.3d 961 (6th Cir. 2014).

When we are confronted with the appeal of a district court's decision denying the petition of a state prisoner which asserts unexhausted habeas claims, we have three options: (1) affirm the denial of the petition if the unexhausted claims are meritless; (2) vacate and remand with instructions to dismiss the petition for lack of exhaustion if there is no "cause" excusing petitioner's failure to exhaust; or (3) vacate and remand the case to the district court if the petitioner has "cause" to excuse his failure to exhaust and wishes to pursue exhaustion of his state court remedies. *See Harris*,

14

553 F. 3d at 1031-32 (citations omitted). In *Rhines*, the Supreme Court noted that the "stay and abeyance" option should only be used where the petitioner had "good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." *Rhines*, 544 U.S. at 278 (citing *Rose v. Lundy*, 455 U.S. 509, 522 (1982)).

As noted above, rather than reviewing the undisclosed evidence collectively, the district court dissected each item of undisclosed evidence piecemeal in violation of Supreme Court precedent. *See Castleberry*, 349 F.3d at 291. Thus, we cannot affirm the district court's ruling because it misapplied the *Brady* standard. Insofar as the district court's ruling denied Eakes' *Brady* claim on the merits, it is vacated. We remand the case to the district court with instructions to stay the case so that Eakes can pursue exhaustion of available state court remedies. Eakes has "good cause" for failing to exhaust his *Brady* claim in state court because his lawyer discovered the documentary evidence only after Eakes had filed his federal habeas petition. Furthermore, as discussed above, Eakes' *Brady* claim is potentially meritorious.

Given the tremendous lapse of time in procuring the undisclosed evidence – and the effort it took to do so – it may seem unfair to direct Eakes back to the state courts to resolve his *Brady* claim. But we are constrained by statute to do so. Accordingly, we **VACATE** the denial of the *Brady* claim on the merits and **REMAND** this case to the district court for further proceedings as outlined above.

15