IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 15, 2020 Session

## WILLIAM E. EAKES, III v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 99-A-35  Seth W. Norman, Judge**

_____

### No. M2019-00050-CCA-R3-ECN

_____

The petitioner, William E. Eakes, III, appeals the denial of his petition for writ of error coram nobis by the Davidson County Criminal Court, arguing the trial court erred in dismissing the petition because newly discovered evidence exists in his case. After our review, we conclude the petition is untimely and does not present a cognizable claim for coram nobis relief. Accordingly, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and CAMILLE R. MCMULLEN, JJ., joined.

Michael C. Holley, Assistant Federal Public Defender, and Richard Lewis Tennent, Nashville, Tennessee, for the appellant, William E. Eakes, III.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Glenn Funk, District Attorney General; and Renee Urb, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

#### Facts and Procedural History

On May 22, 1998, the petitioner and his uncle, Jerry Barnes, strangled the victim, Tehition Christman, to death. When the victim's body was later found in the trunk of his car, "his jewelry, wallet, and shoes were missing . . . [and] one of the victim's pants pockets was turned inside out." *State v. William E. Eakes, III*, No. M2001-01420-CCA-R3-CD, 2003 WL 21523244, at *18 (Tenn. Crim. App. July 1, 2003), *perm. app. denied* (Dec. 22, 2003). The petitioner ultimately confessed to the murder, admitting "that he hit

the victim in the back of the head with the blunt end of the ax" and "that he placed his hands over [Mr.] Barnes's hands to help [Mr. Barnes] choke the victim." *Id.* at *9. For his participation in the victim's death, the petitioner was indicted for and convicted of first-degree felony murder committed during the perpetration of or attempt to perpetrate a robbery and second-degree murder. Tenn. Code Ann. § 39-13-202(a)(2), -210. The trial court merged the two convictions, imposed an effective life sentence, and entered judgments against the petitioner on October 12, 2000.

Over the course of the next several years, the petitioner pursued several state and federal post-trial remedies challenging his convictions. First, the petitioner challenged the evidence supporting his convictions on direct appeal, but this Court determined sufficient evidence existed to support both convictions and affirmed the petitioner's convictions. *William E. Eakes, III*, 2003 WL 21523244, at *16-19.[1] In addressing the evidence supporting the petitioner's felony murder conviction, this Court determined "that the jury could have reasonably inferred that the [petitioner] and [Mr.] Barnes killed the victim and took the victim's possessions from his person by violence, and thus committed murder in the perpetration of or attempt to perpetrate a robbery." *Id.* at *18. This Court also determined sufficient evidence existed to support the second-degree murder conviction as the petitioner admitted to choking the victim, amongst other things, and therefore, "the jury could conclude that the [petitioner] was aware that his conduct on the night of the crime was reasonably certain to cause the victim's death." *Id.* at *19.

In denying relief, this Court summarized Ms. Christman's trial testimony which is pertinent to this appeal, as follows:

> Myra Christman, the victim's mother, testified that in May 1998, she was living in Antioch, Tennessee with the victim and with the victim's step-father, Thomas Ward. She stated that the victim was approximately five feet, eight inches in height; that he weighed approximately 140 to 142 pounds; and that he was right-handed. [Ms.] Christman testified that on the afternoon of May 22, 1998, she went to the credit union to withdraw money from an account that she and the victim shared. She stated that she gave the victim $175 when she got home around 4:00 p.m.
>
> [Ms.] Christman testified that around 9:30 p.m., her sister, who was at [Ms.] Christman's home watching a basketball game on television, answered the telephone. According to [Ms.] Christman, the phone call was from "a young man" who was calling for the victim. [Ms.] Christman

---

[1] A full recitation of the underlying facts supporting the petitioner's convictions are summarized in this opinion. *Id.* at *1-15.

testified that the victim spoke to the person on the phone and then left home around 9:45 p.m. She stated that when the victim departed, he was wearing a pair of blue jean shorts, Michael Jordan tennis shoes worth about $180, and a black and gray striped shirt. She further stated that underneath his shirt, the victim was wearing a gray shirt. [Ms.] Christman testified that the victim was wearing a gold necklace, a gold watch that cost about $380, a gold ring with diamonds in it that cost $528, and a diamond ring in his left ear. [Ms.] Christman noted that the [victim] always carried his wallet with him and that his driver's license was in his wallet.

[Ms.] Christman testified that when the victim left home, his clothes did not have any bleach stains on them, and the victim did not have any noticeable injuries on his body. She reported that the victim left in a 1992 Nissan Sentra that was titled in her name. [Ms.] Christman stated that the car was white with black channels on the side. She noted that when the victim left, the rearview window on the car was not broken.

[Ms.] Christman recalled that when her son did not come home that night, she tried to contact him on his pager. She stated that normally when she paged her son, he returned the call immediately. [Ms.] Christman testified that when the victim was found, he did not have his ring, his watch, his diamond earring, his wallet with his driver's license, his shoes, or the $175 cash that was on his person when he left home.

On cross-examination, [Ms.] Christman testified that the victim did not pay rent to live in her house, but she stated that he gave her money to pay for the telephone bill. She stated that the victim wore designer clothes that he bought himself. [Ms.] Christman acknowledged that the victim had not had a job since July 1997. She testified that the victim was able to buy the clothes because he had saved money. She stated that the victim had worked since he was in the eleventh grade and that he had saved all of his money. [Ms.] Christman testified that the victim had been planning to go to college, so she had set up a fund for him when he was "little."

[Ms.] Christman testified that the victim owned a car and that he paid for his own gas. She maintained she did not know that the victim used drugs. [Ms.] Christman acknowledged that although she was worried about the victim, she did not call the police when he did not return home. She stated that the police came to her home on the Sunday following the victim's Friday disappearance. [Ms.] Christman recalled answering

questions under oath on August 23, 1999, and she acknowledged that she failed to itemize any items that were taken from the victim.

On re-direct examination, [Ms.] Christman testified that the victim had received a settlement in 1997 resulting from a car accident in which the victim's neck and back were injured. On re-cross examination, she acknowledged that the only withdrawal made from the victim's account during April and May of that year was for $300.

*Id.* at *1-2.

The petitioner next sought relief under the Post-Conviction Procedure Act. Tenn. Code Ann. § 40-30-103 (1995). However, his pursuits were unsuccessful as the post-conviction court summarily dismissed the petition, and this Court affirmed the dismissal on appeal. *William E. Eakes, III v. State*, No. M2005-01016-CCA-R3-PC, 2006 WL 163637, at *6 (Tenn. Crim. App. Jan. 23, 2006), *perm. app. denied* (May 30, 2006).

After his initial post-trial efforts were foreclosed in state court, the petitioner filed a petition for writ of habeas corpus in the United States District Court for the Middle District of Tennessee on December 2, 2009, pursuant to 28 U.S.C. § 2254. On May 23, 2013, the district court appointed counsel from the Federal Public Defender's Office to represent the petitioner. In August 2013, habeas counsel reviewed the State's case file from the petitioner's original trial. After doing so, habeas counsel filed an amended petition for relief wherein he requested due process tolling for the petitioner's claims and outlined several pieces of documentary evidence from the State's file that he considered to be *Brady* or *Giglio*[2] material. The alleged *Brady* material, which also forms the basis for the petitioner's present error coram nobis claims, includes several documents the petitioner argued could have been used to impeach the victim's mother, Myra Christman, during trial. After an evidentiary hearing, however, the district court denied the petitioner's *Brady* claims on the merits but granted a certificate of appealability for the *Brady* claims pursuant to 28 U.S.C. § 2253(c). *William E. Eakes, III v. Sexton*, No. 3:10-0367, 2014 WL 31388, at *32 (M.D. Tenn. Jan. 3, 2014), *vacated and remanded*, 592 F. App'x 422 (6th Cir. 2014).

The petitioner appealed his *Brady* claims to the Sixth Circuit which vacated the district court's denial of the claims on the merits. *Eakes v. Sexton*, 592 F. App'x 422, 431 (6th Cir. 2014). In doing so, the Sixth Circuit noted "the district court dissected each

---

[2] *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 153-55 (1972).

- 4 -

item of undisclosed evidence piecemeal in violation of Supreme Court precedent" and as a result, the Sixth Circuit refused to "affirm the district court's ruling because it misapplied the *Brady* standard." *Id.* Furthermore, and pertinent to this appeal, the Sixth Circuit determined the petitioner had failed to exhaust his state court remedies and consequently, remanded the case to the district court for a stay in the proceedings in order to allow the petitioner the opportunity to exhaust the remedies available to him in state court. *Id.*

It is within this procedural setting that the petitioner filed the present petition for writ of error coram nobis on January 12, 2015. Relying on the evidence discovered by habeas counsel in August 2013, the petitioner asserted in his petition that the following "withheld impeachment evidence" constitutes *Brady* material: (1) Officer Jim Malone's initial police report, (2) a "Victim Witness Information," (3) a letter written by Assistant District Attorney (ADA) Jim Milam, (4) an "Investigative Request Form" completed by ADA Lisa Naylor, (5) case notes by ADA T.J. Haycox, and (6) case notes by ADA Naylor. According to the petitioner, the withheld impeachment evidence reveals that Ms. Christman "told a series of apparent lies and thus was likely embellishing to make the killing look like the consequence of a robbery" in order to secure a mandatory life sentence against him. As a result, the petitioner asserted "there is a reasonable probability that the jury would not have found [the petitioner] guilty of felony murder had [Ms.] Christman been impeached using the *Brady* materials" because "the State's case for felony murder was weak," "the withheld evidence would have allowed defense counsel to meaningfully impeach the key witnesses with proof of bias," and "taken collectively, the withheld evidence was material."

In response, the State filed a motion to sever the timeliness of the petition from the substantive issues of the writ of error coram nobis, arguing the petition should be dismissed as untimely because it was filed approximately fourteen years after the expiration of the statute of limitations. The State further asserted even if due process concerns tolled the statute of limitations, the petitioner still waited "roughly a year and a half" to file the present writ during which the petitioner was fully represented by counsel. Upon its consideration, the coram nobis court denied the State's motion to dismiss the petitioner's claims as untimely, noting that the petitioner's liberty interests outweighed the State's interest in avoiding litigation of stale and fraudulent claims and that it did not find the eighteen-month filing delay to be unreasonable.

As the litigation continued, both parties filed numerous motions which were followed by several hearings in the coram nobis court. Most notably, on April 29, 2016, the State filed a "motion to exclude work product materials and strike from the testimony/transcripts all references to work product materials." ADA Pamela Anderson testified at the work product evidentiary hearing on May 13, 2016, and the State

introduced a letter dated May 30, 2013, written to habeas counsel by Victor S. Johnson, III, District Attorney General. In the letter, ADA Anderson explained District Attorney Johnson asserted the work product privilege regarding the petitioner's case file. At the continued hearing on the work product motion on June 24, 2016, Michelle Hendrix, an investigator with the Federal Public Defender's office, detailed her August 2013 review of the State's case file from the petitioner's original trial. Ms. Hendrix explained a State employee was present as she and her colleagues reviewed and scanned documents from the case file, including the documents relied on by the petitioner in his petition and to which the State objected to as work product. After the hearing, the coram nobis court granted the State's motion, in part, and issued a detailed order regarding the admissibility of the challenged evidence both generally and under the work product doctrine, ruling:

> Exhibit 3: [The p]etitioner cedes that the Victim Witness Information form as completed by victim witness coordinator Cathy Harrison may be work product. The document is tangible, it was prepared in anticipation of litigation, and it was prepared by an agent of the State, specifically an employee of the District Attorney's Office. It is work product. There is no indication, however, that it would be useful as impeachment evidence. To all indications, the family of the victim maintained at all times that they believed their son was set up. Exhibit 3 shall be excluded.

> Exhibit 4: The parties largely agree that the letter from ADA Jim Milam is fact work product, though the State objects to paragraphs 2 and 8 as pure opinion work product. There are summaries of statements by State witnesses, particularly Myra Christm[a]n, which may be admissible as impeachment evidence. Exhibit 4 shall generally not be excluded, though the [c]ourt concurs with the State that paragraphs 2 and 8 are pure opinion and therefore not relevant to the [c]oram [n]obis.

> Exhibit 5: The parties agree that the investigative report form by ADA Lisa Naylor concerning Michael Childs is fact work product. The substance is a lack of knowledge by Michael Childs of the murder. This contradicts the statement made by Myra Christm[a]n memorialized in exhibit 4. However, it does not appear that those statements would have been admissible for purposes other than impeachment. Therefore, the extrinsic evidence in Exhibit 5 would not have been admissible. Exhibit 5 shall be excluded.

> Exhibits 6-8: The parties agree that notes by ADAs Lisa Naylor and T.J. Haycox concerning Kevin Childs are fact work product. These include

hearsay by the [p]etitioner's co-defendant. None of these exhibits include statements by Myra Christm[a]n. Exhibit 7 contains, at best, self-exculpatory statements of a co-defendant made to a possible witness. Exhibits 6-8 shall be excluded.

Exhibit 10: Exhibit 10 is a supplemental police report. It is not work product, but the State objects to it as not being *Brady* material subject to mandatory discovery. It contains the witness statement of a friend of the victim and statements by the victim about selling drugs generally and selling drugs to the co-defendant. However, these statements were not dying declarations and would not have been admissible hearsay. Exhibit 10 shall be excluded.

After issuing its initial rulings on August 1, 2016, the coram nobis court conducted the evidentiary hearing the following day during which Myra Christman, Kevin Childs, and Michael Childs testified. Ms. Christman's hearing testimony did not differ substantially from her previous trial testimony. Ms. Christman stated prior to his death, the victim was unemployed and lived with her and her husband, Thomas Ward. The victim had most recently worked as a psychiatric tech at Central State four months prior to his death. During their last interaction on Friday, May 22, 1998, the victim asked Ms. Christman for money to buy a new pair of Michael Jordan tennis shoes. Accordingly, after work that day, Ms. Christman withdrew $300 from her credit union account. Ms. Christman provided bank records to the State showing the $300 withdrawal she made prior to the victim's death. She returned home around 4:00 p.m., her sister came over around 5:00 p.m., and the victim received a phone call around 9:30 p.m. Ms. Christman's sister answered the phone call and told the victim the call was for him. The victim spoke to the caller and then left the house at approximately 9:45 p.m. The victim was wearing a pair of $180 Michael Jordan tennis shoes and carried $175 in cash that Ms. Christman gave him from the withdrawal she made earlier that evening. Ms. Christman noted the victim also maintained an account with the credit union valuing between $6000 and $8000.

Ms. Christman then described the jewelry the victim regularly wore, including a "Brougham necklace," "a ring on each finger," and a watch she purchased for his birthday worth approximately $300 to $380. She noted a $575 gold diamond ring the victim wore that was a Christmas present. Ms. Christman presented photographs which were entered into evidence depicting the victim wearing the jewelry she described. The photographs also showed the victim wearing a "T" necklace, bracelets, earrings, another necklace, and Michael Jordan tennis shoes. Ms. Christman stated she typically purchased a new pair of Michael Jordan tennis shoes for the victim each month. Ms. Christman

- 7 -

explained none of the victim's personal items were recovered after his death, including his pager, jewelry, wallet, shoes, keys, clothing, and the 1992 Nissan Sentra he drove.

Ms. Christman then detailed the night of the victim's murder further, stating she went to bed around 11:00 p.m. but she did not realize something was wrong until the victim failed to respond to her pages and the police came to her house. The first officer who came to her house, however, did not disclose that the victim had died. Rather, she learned of the victim's death when Johnny Lawrence came to her house later that weekend.

During cross-examination, Ms. Christman admitted she loved her son and wanted the petitioner and Mr. Barnes to be punished to the fullest extent under the law. She attended the petitioner's and Mr. Barnes's preliminary hearings but denied learning that they claimed the victim was a drug dealer. Ms. Christman maintained she was unaware of a fight that ensued between the petitioner, Mr. Barnes, and the victim prior to the victim's death. Instead, she believed the petitioner admitted to hitting the victim on the back of the head twice with an ax and almost slicing the victim's ear off prior to killing him. Despite varying details in her trial and hearing testimony, Ms. Christman maintained the victim wore "rings, earrings, [a] necklace, [and a] watch."

The following interaction also occurred regarding Ms. Christman's understanding of the law regarding felony murder:

[Habeas Counsel]: Okay. All right. And you understood, in 1998, that just killing someone wasn't first-degree murder, but if you did it in perpetration of a robbery, it was first-degree murder, correct?

[The State]: Judge –

[Ms. Christman]: If you say so.

[Habeas Counsel]: And so, in fact, under their theory, which was, that they hadn't been trying to rob him, they would not have been guilty of felony first-degree murder?

[The State]: Judge, that calls for an answer beyond the capacity of this witness to analyze law.

[Habeas Counsel]: I'm only asking in the capacity that she knows, Your Honor.

- 8 -

[The Court]: That's right. He's just asking if she knows. She can say whether she knows or not.

[Ms. Christman]: No.

As cross-examination continued, Ms. Christman did not specifically recall an interview she had with ADA Jim Millam on August 5, 1998. As a result, she did not remember telling ADA Millam that the victim had $175 in cash on him from a tax refund, noting instead that the cash was for new Michael Jordan tennis shoes. She also did not remember telling ADA Millam whether the victim was wearing Michael Jordan tennis shoes prior to his death or if she gave the victim $175 in order to purchase a new pair of shoes. Ms. Christman explained she mentioned the victim's personal belongings at trial but "was upset and didn't remember" to discuss the items in the months immediately following the victim's death. She maintained she has always remembered the jewelry that the victim wore.

The petitioner then made an offer of proof regarding information found in ADA Millam's notes:

> That [Ms. Christman] told [ADA] Millam, that she -- that Michael Childs claimed to have been called by Jerry Barnes, who said he had beaten someone down and had a car. . . . And the second thing I would offer is that [Ms. Christman] told [ADA] Millam, that [Mr.] Barnes told Kevin Childs that he had taken money off of a dude and had a homicide on his hands.

Ms. Christman again discussed the timeline leading up to the victim's death and admitted she told ADA Millam that she had been told Corey Watkins called the victim at 9:30 p.m. on Friday despite testifying at trial that she did not know who called. Ms. Chrsitman again stated the victim left the house at 9:45 p.m. and did not respond to her page at approximately 11:00 p.m. She went to work the following day, returned home at 10 a.m., and paged the victim on Saturday evening. Though she did not receive a response, Ms. Christman did not contact the police. A patrol officer came to her house around 12:30 p.m. on Sunday but did not disclose that the victim was dead and instead asked her what kind of car she owned. Ms. Christman did not provide any information "because I didn't know what was going on." She denied that she was worried officers were investigating the victim for selling crack cocaine "because I didn't know [the victim] was dealing cocaine." Ms. Christman corrected her previous testimony, noting she did not page the victim at 11:00 p.m. on Friday.

During re-direct examination, Ms. Christman acknowledged the wrongful death lawsuit she brought against the petitioner and Mr. Barnes for the victim's death during which she gave a deposition and discussed a settlement the victim received after a car accident. Ms. Christman was not shown ADA Millam's letter at the time he wrote it, and she did not remember if she told ADA Millam that the money she gave the victim was from a tax return though she did remember at one point believing the same. However, after Ms. Christman reviewed the bank records, she realized she made a mistake.

During re-cross examination, Ms. Christman again acknowledged her deposition testimony, asserting she testified truthfully during the same. The petitioner entered the trial transcripts from both his and Mr. Barnes's trials into evidence, marking Mr. Barnes's transcript for identification only.[3]

Both Michael and Kevin Childs stated they were testifying at the hearing in response to a subpoena.[4] Michael stated he was a friend of the victim and admitted to having a prior theft conviction. Michael explained he was not in contact with Mr. Barnes at the time of the murder, and he denied telling the victim's parents otherwise. Similarly, Kevin stated he grew up with the victim and admitted he knew the petitioner and Mr. Barnes because he had sold Mr. Barnes cocaine in the past. Kevin stated the petitioner and Mr. Barnes contacted him around the time of the victim's murder. According to Kevin, Mr. Barnes came to his apartment but Kevin did not see what kind of car Mr. Barnes was driving at the time. Kevin noted Mr. Barnes was injured in that "[h]alf his finger was almost bit off" and recalled that Mr. Barnes mentioned he got into a fight with someone. Kevin stated Mr. Barnes did not try to sell him a car that night but did not recall if Mr. Barnes told him he robbed someone. Kevin noted, "Well, I knew, whatever [Mr. Barnes] did, I knew he did some, some wrong, for the simple fact how he came in there, to me, anyway." Kevin recalled testifying in federal court on September 20, 2013, during which he stated that Mr. Barnes did not tell him that he robbed anyone while at his apartment. At the hearing, however, Kevin did not remember if Mr. Barnes told him he took money from someone. Finally, Kevin stated he was truthful in his discussions with the victim's parents after the murder, and he recalled the victim wore a gold "T" necklace, a ring, and might have worn a watch.

During cross-examination, Kevin identified the victim wearing a watch in a photograph. Kevin stated the victim often wore the watch which Kevin believed was a gift from Ms. Christman who "did a lot" for the victim. In additional photographs, Kevin identified the victim's "T" necklace, a ring, and Nike shoes. He recalled talking to the

---

[3] According to the petitioner's brief, after two hung jury trials during which Ms. Christman did not testify, Mr. Barnes ultimately pleaded guilty to second degree murder.

[4] Because the witnesses share the same last name we will refer to them by their first names for clarity. No disrespect is intended.

District Attorney's office around the time of trial but did not remember who he spoke with or what he stated at the time. He admitted to being convicted of felonies in the past, none of which involved crimes of dishonesty.

Upon its review of the arguments and evidence presented, the coram nobis court denied relief, explaining:

> It is the [c]ourt's judgment that the bulk of the evidence put forth in this petition does not rise to the level demanded by *Payne*.[5] Therefore, the [c]ourt must decide whether there is a reasonable probability that impeachment of [Ms. Christman] with the prior inconsistent statement concerning the source of the cash might result in a different outcome. That is the only piece of evidence which is not consistent with at least some other statement given by [Ms.] Christm[a]n that was not in the possession of the [p]etitioner at the time of trial. Further, the State submitted the bank statement of [Ms.] Christm[a]n which shows a withdrawal of $300 on May 22, 1998, which was the date of the offense. The newly-discovered evidence does not call into question that the testimony that the victim wore a great deal of expensive jewelry, much of which [Ms. Christman] purchased and for which she could show receipts. It does not call into question the testimony that [the victim] wore expensive shoes. It does not call into question the testimony that the victim received a phone call and left soon thereafter on the night of his death.

This timely appeal followed.

### *Analysis*

On appeal, the petitioner argues the coram nobis court abused its discretion in denying his petition as he "presented new evidence warranting relief under the coram nobis statute." The petitioner further asserts the coram nobis court erred by ruling the withheld impeachment evidence and/or *Brady* material demonstrating Ms. Christman's bias was inadmissible. More specifically, the petitioner states it was error for the coram nobis court to prohibit "almost all" of his newly discovered evidence, arguing the work-product doctrine does not apply to the evidence and "the court did not even address the law on bias and offered no analysis whatsoever of its application." The petitioner states "when a court considers his newly-discovered evidence in its totality, that evidence is significant enough to meet the substantive coram-nobis standard" because (1) the State's

---

[5] *Payne v. State*, 493 S.W.3d 478, 485 (Tenn. 2016).

felony murder case was weak; (2) the withheld evidence deprived the petitioner of effective cross-examination of Ms. Christman as he was unable to show the depths of her bias without it, asserting she lied and embellished her testimony in order to obtain the harshest punishment available; and (3) the evidence, as a whole, was material to his defense. Ultimately, the petitioner asserts he was deprived of a fair trial and received a life sentence based solely on the testimony of Ms. Christman, a witness whom he was unable to fairly "challenge her credibility by proving her bias."

In response, the State asserts that the petitioner's coram nobis claims are untimely and that the trial court erred in not finding the same. The State argues the petition was filed over one year after the judgment was final in the trial court; due process tolling is not warranted as the petitioner waited eighteen months after discovering the alleged *Brady* material to file his petition for coram nobis relief; and the statute was not tolled as the petitioner pursued his claims in federal court. Substantively, the State asserts the petitioner has failed to present material, newly discovered evidence, and as a result, the coram nobis court did not err in denying the petition. Though the State admits some of the coram nobis court's rulings in denying the petition may have been erroneous, the State nonetheless asserts the "[p]etitioner's reliance on inherent bias, speculative statements, and minor discrepancies is not enough to show that the outcome of his trial may have been different." In his reply brief, the petitioner asserts the coram nobis court appropriately tolled the statute of limitations based upon the applicable "balancing-of-interests test" and argues "the State's response to the merits makes it clear that it would be error to affirm the trial court's ruling."

The writ of error coram nobis in criminal cases is a statutory remedy limited to "errors *dehors* the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding." Tenn. Code Ann. § 40-26-105(b). To obtain relief, a petitioner must show he "was without fault in failing to present certain evidence at the proper time." *Id.* If successful, "a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial." *Id.* "Our supreme court has stated the standard of review as 'whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different.'" *Kenneth Dale Sanders v. State*, No. M2016-00756-CCA-R3-ECN, 2017 WL 633784, at *2 (Tenn. Crim. App. Feb. 16, 2017) (quoting *State v. Vasques*, 221 S.W.3d 514, 525-28 (Tenn. 2007)).

Accordingly, a writ of error coram nobis is an extraordinary remedy available only under very narrow and limited circumstances. *State v. Mixon*, 983 S.W.2d 661, 666

(Tenn. 1999). To obtain coram nobis relief, a petitioner must show "'(1) that he or she was reasonably diligent in seeking the evidence; (2) that the evidence is material; and (3) that the evidence is likely to change the result of the trial.'" *Paul Hayes v. State*, No. W2018-01555-CCA-R3-ECN, 2019 WL 3249898, at *3 (Tenn. Crim. App. July 19, 2019), *perm. app. denied* (Dec. 10, 2019) (quoting *State v. Hall*, 461 S.W.3d 469, 495 (Tenn. 2015)). "'Newly discovered evidence that is merely cumulative or serves no other purpose than to contradict or impeach does not warrant coram nobis relief.'" *Id.* (quoting *Hall*, 461 S.W.3d at 495). The decision to grant or deny a petition for writ of error coram nobis rests within the sound discretion of the trial court. *Id.* (citing *Hall*, 461 S.W.3d at 496).

Before the merits of a coram nobis claim can be reviewed, the petitioner must show that his claims are timely. *Nunley v. State*, 552 S.W.3d 800, 828 (Tenn. 2018) (citing *Harris II*, 301 S.W.3d at 153 (Koch, J., concurring) (internal citations omitted)). A petitioner has one year from the date a judgment becomes final to seek relief under a writ of error coram nobis. Tenn. Code Ann. § 27-7-103. Our supreme court has emphasized that "in Tennessee, the statute of limitations in *coram nobis* cases has historically been 'strictly observed.'" *Nunley*, 552 S.W.3d 800, 828 (Tenn. 2018) (quoting Higgins & Crownover, § 1767, at 701). Our supreme court has warned that "a petition for a writ of error *coram nobis* 'is subject to being summarily dismissed if it does not show on its face that it has been timely filed' and that 'compliance with the timely filing requirement in Tenn. Code Ann. § 27-7-103 is an essential element of a coram nobis claim.'" *Id.* (citations omitted). As such, "the statute of limitations set forth in Section 27-7-103 is not an affirmative defense that must be specifically raised by the State in error *coram nobis* cases; instead, the *coram nobis* petition must show on its face that it is timely filed." *Id.* "This holding is consistent with Tennessee's 'longstanding rule that persons seeking relief under the writ must exercise due diligence in presenting the claim.'" *Id.* (quoting *Mixon*, 983 S.W.2d at 670).

However, due process tolling is permitted within the context of coram nobis claims under limited circumstances. "If the *coram nobis* petition does not show on its face that it is filed within the one-year statute of limitations, the petition must set forth with particularity facts demonstrating that the prisoner is entitled to equitable tolling of the statute of limitations." *Nunley*, 552 S.W.3d at 829. Thus, in order "[t]o accommodate due process concerns, the one-year statute of limitations may be tolled if a petition for a writ of error *coram nobis* seeks relief based upon new evidence of actual innocence discovered after expiration of the limitations period." *Id.* at 828-29 (citations omitted). "The doctrine of equitable tolling requires the court to consider 'the governmental interests involved and the private interests affected by the official action.'" *Id.* at 830 (quoting *Workman v. State*, 41 S.W.3d 100, 103 (Tenn. 2001)). The two interests "are weighed to determine whether due process requires tolling of the statutory

limitations period, in light of the fact that 'due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner.'" *Id.* (quoting *Burford v. State*, 845 S.W.2d 204, 208 (Tenn. 1992)). "Based on the facts of the particular case, the *coram nobis* petition must be filed within a time period that 'does not exceed the reasonable opportunity afforded by due process.'" *Id.* (citing *Sample v. State*, 82 S.W.3d 267, 276 (Tenn. 2002); *Workman*, 41 S.W.3d at 103; *see also Workman*, 41 S.W.3d at 105-06 (Anderson, Riley, J., dissenting) ("noting that, even if statute of limitations was tolled during time in which petitioner was unaware of the new evidence, 'the record in this case shows that more than one year, the time provided by the statute of limitations, has passed since he first became aware of the evidence,' so 'due process is not implicated'")). "Whether a petitioner is entitled to due process tolling of the statute of limitations is a mixed question of law and fact, which we review de novo with no presumption of correctness." *Hayes*, 2019 WL 3249898, at *3 (citing *Nunley*, 552 S.W.3d at 830).

Here, it is undisputed the petitioner's coram nobis petition was filed outside the applicable one-year statute of limitations period as the petitioner's judgments were entered October 12, 2000, and his petition was not filed until January 12, 2015, after he discovered the alleged *Brady* material in August 2013. As such, this Court must determine if the petitioner is entitled to equitable tolling before we can reach the merits of the petitioner's claims. Guided by *Nunley*, we must first look to the petition to determine if it includes facts sufficient to warrant review under the principles of equitable tolling. 552 S.W.3d at 829. In his petition and as supported by the record, the petitioner asserted "[t]he impeachment materials were not made available to [the petitioner] until he was litigating his federal habeas corpus petition." The petitioner further stated the coram nobis "remedy is available notwithstanding the one-year filing deadline because the prosecutor's *Brady* violation was the very cause of [the petitioner's] delay in litigating this claim and because, due to a trial flawed by the *Brady* violations, he is serving a life sentence." Accordingly, our review indicates the petitioner effectively requested equitable tolling of his claims in his petition. Prior to denying the petition, the coram nobis court addressed the applicability of equitable tolling on the petitioner's claims and determined the petitioner was entitled to equitable tolling because the petitioner's liberty interests outweighed the State's timeliness interests. As a result, the coram nobis court ruled the petitioner's seventeen-month delay in filing his petition was not unreasonable. We, however, disagree.

After timely seeking relief on direct appeal and under the Post-Conviction Procedure Act, the petitioner moved his post-trial pursuits to the Federal District Court by filing a writ of habeas corpus in 2009. The district court appointed counsel in May 2013, and habeas counsel discovered the alleged *Brady* material in August 2013. Instead of filing a petition for writ of error coram nobis in state court, the petitioner continued with

his federal habeas claims by filing an amended petition for relief. As explained previously, the petitioner's habeas claims were ultimately stayed in district court upon entry of an order filed by the Sixth Circuit on November 25, 2014. After the Sixth Circuit's order, the petitioner still waited until January 12, 2015, to file the present writ. "No statute in Tennessee nor tolling rule developed at common law provides that the time for filing a cause of action is tolled during the period in which a litigant pursues a related but independent cause of action." *Harris v. State*, 301 S.W.3d 141, 146 (Tenn. 2010), *overruled by Nunley v. State*, 552 S.W.3d 800 (Tenn. 2018). Accordingly, upon our de novo review of the record and the petitioner's case as a whole, we conclude equitable tolling is not warranted as the petitioner filed the present petition for writ of error coram nobis approximately seventeen months after discovering the alleged *Brady* material. Though the record indicates the petitioner was actively pursuing his *Brady* claims in federal court during the seventeen-month delay, it was well within the petitioner's control to separately file a state petition for writ of error coram nobis while his federal habeas claims were pending. The petitioner unfortunately failed to do so. His failure, however, does not warrant equitable tolling. *Cf. Burrell v. State*, No. E1999-02762-CCA-R3-PC, 2001 WL 15792, at *2 (Tenn. Crim. App. Jan. 8, 2001) (holding within the context of the untimely filing of a petition for post-conviction relief "that due process does not require tolling the statute of limitations while a petition for certiorari is pending before the United States Supreme Court"); *Crystle D. Rutherford v. State*, No. M2013-01575-CCA-R3-PC, 2014 WL 1669960, at *2 (Tenn. Crim. App. Apr. 25, 2014) (noting "due process serves to toll the post-conviction statute of limitations for petitioners who face circumstances beyond their control . . . which preclude them from actively raising their post-conviction claims"). Accordingly, the petitioner's request for coram nobis relief is time-barred.

In its order, the Sixth Circuit suggested the petitioner "has 'good cause' for failing to exhaust his *Brady* claim in state court because his lawyer discovered the documentary evidence only after [the petitioner] had filed his federal habeas petition." *Eakes v. Sexton*, 592 F. App'x 422, 431 (6th Cir. 2014). However, since the Sixth Circuit ordered a stay in the petitioner's federal habeas claims, our supreme court issued its opinion in *Nunley v. State*, 552 S.W.3d 800, which we have referenced previously. The *Nunley* court held, in part, "that an error *coram nobis* proceeding is not the appropriate procedural vehicle for obtaining relief on the ground that the defendant suffered a constitutional due process violation under *Brady*." *Id.* at 819. The *Nunley* court further explained "[i]f the newly discovered evidence that is the subject of an error *coram nobis* petition happens to also be material information favorable to the defense that the State improperly suppressed at trial (sometimes referred to as "*Brady*" evidence), the claim must be evaluated in accordance with the requirements of the *coram nobis* statutes." *Id.* (citation omitted). Accordingly, our review of the petitioner's claims begins and ends with the applicable statute of limitations to which the petitioner failed to adhere. *Id.* at

819, 821.  Because due process tolling is not warranted in this case for reasons stated above, the petition is untimely, and the petitioner is not entitled to relief as a result.

## *Conclusion*

Based on the foregoing authorities and reasoning, we dismiss the petition as untimely.

_____
J. ROSS DYER, JUDGE